Stephen G. Larson, State Bar No. 145225
slarson@larsonllp.com
Stephen E. Bledsoe, State Bar No. 157811
sbledsoe@larsonllp.com
Rick Richmond, State Bar No. 194962
rrichmond@larsonllp.com
**LARSON, LLP**
600 Anton Blvd., Suite 1270
Costa Mesa, CA 92626
Telephone: (949) 516-7250
Facsimile: (949) 516-7251

Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
James G. Perry, State Bar No. 281356
jgp@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
18565 Jamboree Road, Suite 550
Irvine, CA 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEYOND BUSINESS INCORPORATED, d/b/a BIG FISH BAIT & TACKLE, individually and on behalf of others similarly situated,<br><br>              Plaintiff,<br><br>vs.<br><br>AMPLIFY ENERGY CORPORATION, d/b/a BETA OFFSHORE, a Delaware Corporation; BETA OPERATING COMPANY, LLC, a Delaware Limited Liability Company; SAN PEDRO BAY PIPELINE COMPANY, a California Company,<br><br>              Defendants. | Case No.  8:21-cv-1714<br><br>**COMPLAINT – CLASS ACTION**<br><br>1. Violations of the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Gov. Code § 8670, *et seq.*<br><br>2. Violations of Oil Pollution Act, 33 U.S.C. § 2701, *et seq.*<br><br>3. Strict Liability for Ultrahazardous Activities (Based on California and Federal Law)<br><br>4. Negligence (Based on California Law)<br><br>5. Violations of the California Unfair Competition Law, Cal. |

Bus. & Prof. Code § 17200, *et seq.*

6. Negligence Per Se (Based on California Law)

7. Negligent Interference with Prospective Economic Advantage (Based on California Law)

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

*Page*

I      INTRODUCTION ................................................................................ 1

II     NATURE OF THE ACTION .............................................................. 1

III    JURISDICTION AND VENUE ......................................................... 4

IV     PARTIES ............................................................................................ 4

    A.     Plaintiff ................................................................................... 4

    B.     Defendants ............................................................................. 5

V      GENERAL ALLEGATIONS ............................................................. 5

    A.     The Rich and Unique Character of the Orange County Coastal Communities ......................................................... 5

    B.     The Elly Oil-Processing Platform and San Pedro Bay Pipeline .......... 7

    C.     Defendants' Knew of the Monumental Risks Associated with Their Ultrahazardous Activities ................................... 10

    D.     Defendants' Oil Spill Prevention Plan and Responsibilities ............ 11

    E.     The Precursor to the Crisis Should Have Been Obvious ................... 14

    F.     The Early Warnings of the Oil Spill Crisis ......................................... 16

    G.     Defendants Failures on Saturday October 2, 2021 ........................... 17

    H.     Fallout from Defendants' Failures ...................................................... 19

    I.     Defendants' History of Violations ...................................................... 24

VI     PLAINTIFF'S ALLEGATIONS ....................................................... 26

VII    CLASS ACTION ALLEGATIONS ................................................. 27

VIII   CAUSES OF ACTION ...................................................................... 30

              COUNT I:      STRICT LIABILITY UNDER LEMPERT-KEENE-SEASTRANDOIL SPILL PREVENTION AND RESPONSE ACT ("OSPRRA") ............................. 30

              COUNT II:      OIL POLLUTION ACT OF 1990 ............................. 32

TABLE OF CONTENTS (cont.)

*Page*

COUNT III:    STRICT LIABILITY FOR ULTRAHAZARDOUS
              ACTIVITIES ............................................................ 33
COUNT IV:     NEGLIGENCE ....................................................... 35
COUNT V:      VIOLATIONS OF CALIFORNIA UNFAIR
              COMPETITION LAW ............................................ 37
COUNT VI:     NEGLIGENCE PER SE .......................................... 39
COUNT VII:    NEGLIGENT INTERFERENCE WITH
              PROSPECTIVE ECONOMIC ADVANTAGE ....... 40
PRAYER FOR RELIEF ......................................................... 41
DEMAND FOR JURY TRIAL ............................................... 42

Class Action Complaint                              Case No.:

# I     INTRODUCTION

Plaintiff BEYOND BUSINESS INCORPORATED, d/b/a BIG FISH BAIT & TACKLE, individually and on behalf of all others similarly situated, allege the following against AMPLIFY ENERGY CORPORATION ("AEC") d/b/a BETA OFFSHORE, BETA OPERATING COMPANY, LLC ("BOC"), and SAN PEDRO BAY PIPELINE COMPANY ("SPBPC") (collectively "Defendants"). The following allegations, where applicable, are based upon personal knowledge, information and belief, and the investigation and research of counsel.

# II     NATURE OF THE ACTION

1.     On Saturday October 2, 2021, at 2:30 a.m., an alarm sounded on the Elly oil platform, which is positioned roughly eight and one-half miles off the Orange County, California coastline. The alarm, designed to alert a 24-hour surveillance crew member(s) of low-pressure in the 41-year-old, 17.5-mile-long San Pedro Bay crude oil pipeline ("San Pedro Bay Pipeline")[1], went unnoticed or disregarded. Not until 6:01 a.m. did Elly shutdown the flow of toxic crude oil through the 16-inch diameter San Pedro Bay Pipeline. The damage had already been done. By 6:01 a.m., up to 130,000 gallons, over 3,100 barrels, of toxic crude oil were estimated to have been released into the Pacific Ocean at a point roughly four and one-half miles offshore of the pristine beaches of Southern California. By Saturday evening and into early Sunday morning of October 3, 2021, toxic crude oil washed ashore in Huntington and Newport Beach.

2.     AEC, the owner and, through BOC and SPBPC, operator of Elly and the San Pedro Bay Pipeline, failed to alert the United States Coast Guard ("Coast Guard") of the marine environmental crisis until 9:07 a.m. on Saturday, October 2, 2021. What makes this failure evening more alarming, many in the surrounding area recognized a problem long before the Defendants. On Friday October 1, 2021, residents of the local beach communities began to smell oil in the air. The crew of at

---

[1] The San Pedro Bay Pipeline is formally known as Pipeline P00547.

Class Action Complaint                                    Case No.:

least one commercial vessel noticed an oil slick on the water in the San Pedro Bay at 6:13 p.m. and notified the National Response Center ("NRC") at 8:22 p.m. As the commercial vessel made its observations, satellite imagery, at 7:00 p.m. on Friday October 1, 2021, identified a three-mile-wide oil "anomaly" in the San Pedro Bay. The National Oceanic and Atmospheric Administration ("NOAA"), upon receipt of this information, notified the Coast Guard of the anomaly at 2:06 a.m. on Saturday October 2, 2021.

3.      That "anomaly" became a nightmare for the citizens and wildlife that claim the Orange County coast as their home. The toxic crude oil covered the Huntington and Newport Beach coastline by end of day on Sunday October 3, 2021, leaving coastal waters, beaches, animals, and State Marine Conservation areas devastated by petroleum. This tragic reality is but the beginning, as the original 8,320-acre oil slick has broken up, with large swaths traveling southward down the coast, closing beaches, waterways, fishing grounds, and marine operations within every mile.

4.      The fate of Orange County, California, a tourism powerhouse, responsible for billions of dollars in revenue from those destined to experience the rich beach culture and way of life in Southern California, is now polluted. People from all over the world travel to Huntington Beach, Newport Beach, Laguna Beach, and Dana Point to enjoy and appreciate the diverse animal life, beach and ocean activities, five-star restaurants with freshly-sourced seafood, and small-business pleasures, to name a few. These attractions form the backbone of the local economies and some may feel the impact of this crisis for years to come. For those that call the Orange County coast their home, livelihood, and refuge, they have been significantly harmed.

5.      This crisis, an all but familiar reminder of the 2015 Santa Barbara oil spill, could have been avoided. The San Pedro Bay Pipeline, positioned in a heavily-trafficked area of the San Pedro Bay, laid open to the elements and external forces

1    with no regard for the real possibility that any manipulation of the pipeline,

2    intentional or otherwise, could not be detected by the Defendants. Rather than

3    burying the pipeline in the heavily-trafficked area—as is the case for the miles of

4    pipeline leading to their pump station—or at least generating a monitoring plan that

5    could readily identify such an event in a short period of time, Defendants chose to

6    remain ignorant. As a result, damage to Defendants' San Pedro Bay Pipeline

7    occurred and went unnoticed, at a minimum, or ignored, at worst, for days, if not

8    months. Simply put, Defendants' monitoring system, manual and otherwise, was

9    recklessly inept.

10        6.    Defendants' failure to detect, notify, and respond to the oil leak turned

11   what could have been a painful, but manageable event, into marine environmental

12   crisis. Defendants' oil system, with only two means of electronically sensing a

13   potential crisis—pressure and flow changes within the pipeline—was woefully

14   insufficient for the high-consequence area in which they were operating. Worse,

15   when the surrounding community knew of the imminent crisis, Defendants

16   purportedly did not. When observers of satellite imagery over San Pedro Bay knew

17   of the imminent crisis, Defendants purportedly did not. When Elly's own monitoring

18   system knew there was a problem, Defendants purportedly did not. Defendants

19   purportedly knew nothing until hours after the crisis had already unfolded, despite

20   having crew who staff the Elly control room 24-hours a day and are guided by their

21   own Oil Spill Prevention and Response Plan ("OSPRP")[2] which explicitly provides:

22   "**In General – For Spill Response – Do Not Delay. Plan Ahead. Over respond**

23   **and stand down if necessary. Do not get behind the curve.**" (Emphasis added.)

24        7.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure,

25   Rule 23 on its own behalf and as representatives of those similarly situated to recover

26

27   [2] Beta Unit Complex, Oil Spill Prevention and Response Plan, Apr. 2012,
     https://www.bsee.gov/sites/bsee.gov/files/oil-spill-response-plan-osrp/inspection-
28   and-enforcement/beta-operating-company-osrp-april-2012.pdf [last visited Oct. 10,
     2021].

Class Action Complaint                                    Case No.:

the inevitably substantial economic losses they have incurred and will continue to incur as a result of Defendants' reckless oil spill.

### III    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one member of the class of plaintiffs and one defendant are citizens of different States.

9.      Jurisdiction of this Court also exists pursuant to 28 U.S.C. § 1331 because the claims asserted by Plaintiff arises under federal law. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Plaintiff because Plaintiff resides in this District and submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because they conducted and continue to conduct substantial business in the District, and because they have committed the acts and omissions complained of herein in the District, including the commission of the Huntington Beach Oil Spill.

11.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, omissions, and inactions giving rise to Plaintiff's claims occurred in this District, and because Defendants discharged crude oil onto the beaches of and conduct business in Orange County.

### IV    PARTIES

**A.    Plaintiff**

12.     Plaintiff BEYOND BUSINESS INCORPORATED, d/b/a BIG FISH BAIT & TACKLE, is California corporation located in Seal Beach, California.

**B.      Defendants**

13.      Defendant AEC is a Delaware corporation with its principal place of business in Houston, Texas. AEC owns and operates the Elly oil platform and San Pedro Bay Pipeline through its subsidiaries, Defendant BOC and Defendant SPBPC. Martyn Willsher serves as the Chief Executive Officer for all three entities.

14.      Defendant BOC, a Delaware limited liability company with its principal place of business in Houston, Texas.

15.      Defendant SPBPC, a California company with its principal place of business in Houston, Texas.

16.      Defendants own and/or operate the Beta Unit Complex—Platforms Elly, Ellen, and Eureka, and the San Pedro Bay Pipeline—and are responsible for the production, processing, and transportation of crude oil along the Orange County, California coast through that oil system.

**V      GENERAL ALLEGATIONS**

**A.      The Rich and Unique Character of the Orange County Coastal Communities**

17.      From Seal Beach down to San Clemente, the coastal regions of Orange County offer beautiful and pristine beaches to residents and travelers from all over the world. Residents and visitors pay a premium to live in and travel to these stunning areas for the opportunity to appreciate and take advantage of the beaches, waters, and views. Throughout the year, residents and visitors are able to, and do, utilize the beach communities for entertainment, such as family outings or surfing events; recreation, such as kayaking, surfing, sailing, boating, or biking; fine dining and tasting local seafood; and experiences, such as whale and dolphin watching, fishing excursions, and sunset cruises. (*See* Images 1-3 on next page.)

1

2

3

4

5

6

7

8

 

**Image 1**, Huntington Beach, Courtesy of *Willyou.net*

**Image 2**, Dana Point, Courtesy of *Trip Advisor*

**Image 3**, Newport Beach, Courtesy of *The Travel Mag.*

9

10

11

12

13

14

15

16

     18.    The Orange County tidepools, wetlands, and coastal waters, offer an abundance of diverse animal life, from fish and birds, to lobsters and sea lions. The Talbert Marshlands, for example, a critical link in migratory bird routes, is home to at least 90 species of shorebirds.[3] Tidepools, flourishing with everything from star fish and crabs to sea urchin and snails, provide a glimpse into the delicate ecological balance of the coast. The coastal waters, a draw for enumerable reasons, are flush with various fish species—e.g., surf perch, corbina, and halibut—and other marine life—e.g., killer whales, humpback whales, sharks, and seals.

17

18

19

20

21

22

23

24

     19.    More than merely an outlet for a breathtaking experience, the Orange County coast is a source of work and income for thousands of people. Huntington and Newport Beach alone generate roughly two billion dollars yearly from visitors, which, in turn, supports thousands of jobs within those communities. Businesses—such as beach events, restaurants, hotels, retail stores, harbor tours, and niche boutiques, to name a few—are the backbone of the coastal economy. Fishers, including those who catch or harvest fish and/or shellfish along the Orange County coast, are a vital community component. This group, who source local businesses and

25

26

27

28

---

[3] Cal Matters, *A Rare Ecological Gem is Slicked with Spilled Oil – Again*, Oct. 5, 2021, https://calmatters.org/environment/2021/10/california-oil-spill-talbert-marsh/ [last visited Oct. 13, 2021].

Class Action Complaint          Case No.:

beyond with fresh seafood, is dependent on the availability of all types of sea life, such as sea bass, sculpin, tuna, halibut, yellowtail, lobsters, and more.

**B.      The Elly Oil-Processing Platform and San Pedro Bay Pipeline**

20.     AEC, through BOC, owns and operates the Elly oil-processing platform, which is situated in 255 feet of water. The platform sits above the Beta Field, an oil reserve, roughly eight and one-half miles offshore off the north Orange County coast. AEC also owns the two neighboring oil-producing platforms, Ellen and Eureka, that interact with Elly. (*See* Image 4.) The oil system is referred to at the Beta Unit Complex.



**Image 4**, Elly Oil Platform,
Courtesy of *Los Angeles Times*

21.     Elly is connected to the Beta Pump Station in Long Beach, California by the seventeen and a half-mile long San Pedro Bay Pipeline, (*see* Image 5 on next page), which AEC owns and operates through SPBPC. Elly and the San Pedro Bay Pipeline were constructed in 1980. Elly controls the flow of crude oil harvested from the seventy oil wells in the Beta Field through the 16-inch diameter San Pedro Bay Pipeline. The pipeline is a mix of concrete and steel. The exterior of the pipeline consists of a .375-inch-thick concrete casing. The interior of the pipeline consists of a

.500-inch-thick, X-42 grade carbon steel line pipe ("X-42 Pipe"). Prior to the rupture, the San Pedro Bay Pipeline was reported to be operating at approximately 300-400 pressure per square inch gauge ("psig").[4]



**Image 5**, Beta Unit Complex

[4] U.S. Dept. of Trans. Pipeline and Hazardous Materials Safety Admin., Corrective Action Order, CPF No. 5-2021-054-CAO, Oct. 4, 2021, https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2021-10/Beta%20Offshore%20CAO.10.04.2021.pdf [last visited on Oct. 13, 2021].

22.     Per Defendants' own records, they were producing roughly 3,600 barrels (151,200 gallons) of oil per day in the second quarter of this year, making it the second largest offshore oil-producer *in California*.[5] To put this number into perspective, if the "best-case scenario" of 30,000 gallons of crude oil was spilled over *two days* during this disaster, that would mean a reduction of at least 10% production per day over those two days. If the number of days of the leak is doubled to *four*, Defendants would have experienced a 5% reduction in their daily production. In a "worst-case scenario" of 130,000 gallons of crude oil spilled, the numbers dramatically rise to 43% and 21.5% respectively. Which begs the question: how could the Defendants have failed to notice such a non-trivial, at a minimum, or significant, at worst, drop in *their own production numbers*? Worse, how could the Defendants have failed in such an alarming fashion in the high-consequence area of the Orange County coast?

23.     The Defendants were required to have, and purportedly did have, sensors to monitor irregularities and/or failures in the transportation of crude oil through the San Pedro Bay Pipeline.[6] In fact, according to two former employees, the Defendants purportedly had software "made specifically" for the platforms in order to monitor the status of pressure at pumps along the pipeline," utilizing sensors within the San Pedro Bay Pipeline.[7] Sensors were utilized to measure the pressure within the San Pedro Bay Pipeline. But it was not just the pressure within the system that the Defendants claimed to monitor, but also flow rate. Per their OSPRP, under the heading "Leak Detection System," "Alarms are initiated if volume balance discrepancies vary beyond specific short-term and long-term limits."[8]

---

[5] Reuters, *Despite Preparation, California Pipeline Operator May Have Taken Hours to Stop Leak*, Oct. 8, 2021, https://www.reuters.com/business/energy/despite-preparation-california-pipeline-operator-may-have-taken-hours-stop-leak-2021-10-08/ [last visited Oct. 13, 2021] ("Reuters").
[6] *Id.*
[7] *Id.*
[8] *See* OSPRP, fn. 2.

24.     Defendants' oil system purportedly did not incorporate any other means of sensing irregularities or failures, such as exterior thermal changes or acoustic or vibration anomalies, to name a few. Meaning, unless the pressure or flow within the San Pedro Bay Pipeline changed to a sensor-triggering degree, Defendants' software security measure was incapable of identifying any irregularity or failure within their own system. Putting aside the oil system's non-human "safeguards," Defendants purportedly had human operators in place, who manned the Elly control room 24-hours a day and were trained to identify any and all problems related to an oil spill crisis, as a check on the system. According to a former employee who is familiar with the Defendants' oil system, if operators "detected a single barrel [loss], the pipeline should have been shut."[9]

25.     According to Willsher, Defendants monitored the San Pedro Bay Pipeline on a weekly basis. If true, this necessarily means that Defendants would and/or should have been aware of a significant relocation of a section of pipeline along the ocean floor, for example. Defendants, by their own account, were completely unaware of such a significant alteration in the San Pedro Bay Pipeline.

**C.     Defendants' Knew of the Monumental Risks Associated with Their Ultrahazardous Activities**

26.     In 2019, Defendants, through an Environmental Assessment ("EA"), titled Beta Unit Geographical Survey, were made acutely aware of the hazardousness of their activities in the Beta Field. Under the heading "Hazardous Materials/Risk of Upset," Defendants are notified that the area of their oil system is "utilized for recreational, industrial, and commercial purposes." The EA goes on to state: "The primary statutes, regulations, plans, and policies relevant to the Project that address potential risk of upset related to hazardous materials is provided" below. What follows is a list of major international, federal, and state regulations designed to keep the public and environment safe.

---

[9] Reuters, fn.5.

27.     Defendants' activities were not limited to the Beta Field nine miles offshore, however, which in itself is an elevated risk, but traversed directly into and along the Orange County coastal communities. Miles of the San Pedro Bay Pipeline, including the location of the purported oil spill, are less than five miles off the Orange County coast. The last two miles are directly within and under the City of Long Beach, through "piers G and H."[10] There can be little doubt that the transportation of crude oil through the San Pedro Bay Pipeline carries with it extraordinary risks to the safety of the general public and economic welfare of the surrounding communities. In fact, the San Pedro Bay Pipeline traverses a High Consequence Area ("HCA"), pursuant to 49 C.F.R. § 195.450, and an unusually sensitive ecological area, pursuant to 49 C.F.R. § 195.6.

28.     The OSPRP explicitly states: "The San Pedro Bay Pipeline . . . is considered to be capable of causing significant and substantial harm to the environment in the event of a discharge of oil because of its proximity to navigable waters and adjoining shoreline areas designated as environmentally sensitive . . . ."[11]

29.     Defendants did not need to be told that their operations presented significant safety and economic risks to the local communities. It was obvious. As discussed above, (*see* Section V A.), the Orange County coastal community was home to a diverse animal population, sensitive ecological preserves, and businesses and events that cater to every means of enjoyment and livelihood one can imagine. Defendants merely had to look out their front door to understand this reality.

**D.     Defendants' Oil Spill Prevention Plan and Responsibilities[12]**

30.     The Defendants' April 2012 OSPRP begins with a very direct punctuation of the danger their activities pose. The OSPRP provides: "A worst-case crude oil release from the DOT-regulated San Pedro Bay Pipeline could potentially

---

[10] OSPRP, fn. 2.
[11] *Id.*
[12] OSPRP, fn. 2.

Class Action Complaint                                          Case No.:

cause significant and substantial harm to the environment, as defined in the Oil Production Act of 1990 . . . ." And further makes the point that:

> These response guidelines are not intended to supplant the use of common sense or actions not specifically mentioned in this plan, but necessary to mitigate a problem. Depending on the incident, each response may require different or modified approaches or sequences of events to reach the primary objective of the [Defendants]; that is, to ensure the safety of life, protection of the environment, and protection of property.

31.    The OSPRP goes on to identify the potential victims of a worst-case crude oil release, noting: 1) "[n]earby population center"; 2) "[p]roperties at risk (marines, beaches, harbors, parks)"; 3) "[e]conomic and cultural resources"; 4) "[b]iological resources (e.g., sensitive habitats, commercial and recreational fish/shellfish stocks, wildlife, plant life)"; and 5) "[o]ther marine dependent uses." To prevent the potential devastating impacts to these victims of an oil spill, a "[n]o response option (i.e., mechanical or non-mechanical) should be ruled out in advance."[13] The importance of effective responses to the immediate detection of an oil spill is compounded by the fact that spills originating from the oil system "can present challenges to response and recovery efforts due to obstacles and proximity to bodies of water. **In General – For Spill Response – Do Not Delay. Plan Ahead. Over respond and stand down if necessary. Do not get behind the curve."** (Emphasis added.)[14]

32.    The OSPRP provides that a worst-case scenario of an oil spill is 3,111 barrels, which is the equivalent of 130,662 gallons. According to Willsher, the San Pedro Bay Pipeline, from end-to-end, is capable of holding 126,000 gallons of crude oil.[15]

---

[13] *Id.*
[14] *Id.*
[15] NBC News, *Oil Spill Off California Coast Closes Pipeline, Prompts Warnings of Ecological Disaster*, Oct. 3, 2021, https://www.nbcnews.com/news/us-news/major-cleanup-operation-launched-after-oil-slick-detected-southern-california-n1280638 [last visited Oct. 13, 2021].

Class Action Complaint                                          Case No.:

33.     Critical to the matter at hand, the OSPRP specified the precise "Leak Detective System" utilized by the Defendants. The Beta Unit Complex purportedly incorporates a working "automated" system that "continuously monitors" the San Pedro Bay Pipeline. In the event of an irregularity or "any anomalies," the control room, "**staffed 24 hours/day**," is required to report its observations immediately. (Emphasis added.) The lead detection system, which monitors the "flow difference between inlet and outlet, . . . will consider generating a leak alarm when the test statistic reaches a certain limit (the alarm threshold)."[16] The pertinent threshold being: "1%" of "nominal flow" change over the course of "50 min."[17] Further, this analysis is based upon an "observed flow rate of 260 bbls/h," or 6,240 barrels (262,080 gallons[18]) of oil per day. Meaning, unless the system detects a "nominal flow change" of *1%* of 217 barrels (9,114 gallons) per 50 minutes—21.7 barrels or 911 gallons per 50 minutes—no alarm goes off.[19] To emphasize the point, the system allows for 20,000+ gallons of crude oil to be leaked per day (15 gallons/minute, 900 gallons/hour, 21,600 gallons/day) without Defendants having any clue, potentially.[20]

34.     This creates the even more concerning possibility of a prolonged discharge of 20,000+ gallons of crude oil per day. With a worst scenario—an oil leak falling below the sensor-triggering limit—days, if not months, of leakage can result in significant pollution of the Pacific Ocean and its surrounding communities.

35.     The OSPRP further provides: "[s]urveillance of the line with this leak detection system" occurs through the control room, "which is manned 24 hours per day." Each person in that control room is to be able to "recognize the alarms

---

[16] OSPRP, fn. 2.
[17] *Id.*
[18] One barrel of oil is the equivalent of 42 gallons.
[19] OSPRP, fn. 2.
[20] As the flow of oil through the San Pedro Bay Pipeline was potentially half the flowrate of the benchmark amount discussed *infra*, the even more concerning possibility that Defendants allowed crude oil to leak into the Orange County coastal waters for more than a few days emerges.

generated and respond to each alarm."[21] Should an alarm be triggered, "control room operators have the ability" to automatically shut down the "shipping pumps" by use of a "shutdown valve."[22] Such critical responsibilities come with training, and Defendants "emphasize that, in the event a leak is detected, it is essential to close the platform and onshore shut-in valves as quickly as possible after shutting down shipping pumps to minimize the volume of oil released from the line."[23]

**E.    The Precursor to the Crisis Should Have Been Obvious**

36.    During the week of October 4, 2021, investigators discovered a 13-inch, linear fracture in the San Pedro Bay Pipeline, roughly four-and-a-half miles offshore. (*See* Image 6 on next page.) Investigators further noted that the 4,000-foot section of the pipeline, where the damage was found, had been moved roughly 105 feet from its original resting point. (*See* Image 7 on next page.) Investigators now believe the manipulation of the San Pedro Bay Pipeline could have occurred as far back as a year earlier, possibly caused by multiple anchor strikes.[24] What is alarming, however, is that Defendants had no ability to identify this significant manipulation of the pipeline and/or recklessly failed monitor, respond to, or notify the appropriate authorities of the event. By all accounts, the force needed to move the 4,000-foot section of pipeline would be significant, begging the question how such an event could occur

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] CNN, *Pipeline Crack in California Oil Spill May Have Occurred Up to a Year Ago, Investigators Say*, Oct. 8, 2021, https://www.cnn.com/2021/10/08/us/california-oil-spill-friday/index.html [last visited Oct. 10, 2021].

Class Action Complaint                                    Case No.:

without triggering a single sensor—pressure, flow, or otherwise—or notifying the
Elly control center.



**Image 6**, 13-inch Facture



**Image 7**, Movement of Pipeline

37.     Putting aside technology, Defendants' manual or human detection of irregularities in the San Pedro Bay Pipeline was nonexistent. Defendants claim they monitored the pipeline weekly by boat[25] and further cleaned the pipeline weekly[26]. Given that the resting point the 4,000-foot section of the pipe had been moved 105 feet, (*see* Image 7), weeks and/or months earlier, as has been acknowledged by investigators[27], Defendants were negligent, at a minimum, or reckless, at worst, in not identifying and rectifying the precursor to the current oil spill crisis. This is especially true in light of the fact that the number of large vessels anchored in San Pedro Bay increased significantly during the ongoing global COVID-19 pandemic, well before this incident occurred.[28]

**F.      The Early Warnings of the Oil Spill Crisis**

38.     At 6:13 p.m., crew from a commercial vessel anchored in the San Pedro Bay noticed a "sheen" of oil on the water. The vessel subsequently reported its findings to the NRC at 8:22 p.m. Around this same period of time, residents of the Orange County coastal communities began to smell oil in the air. In fact, the Huntington Beach Police Department received so many calls about the smell of oil in the air that they put out an advisory to the public about the issue.[29] At 7:00 p.m., satellite imagery identified a three-mile-wide oil "anomaly" in the San Pedro Bay. NOAA forwarded this information to the Coast Guard at 2:06 a.m. on Saturday,

---

[25] Reuters, fn. 5.
[26] WTVA, A Timeline of the California Oil Spill, From the First Report to the Clean-Up, Oct. 10, 2021, https://www.wtva.com/templates/AMP?contentID=575498582 [last visited Oct. 13, 2021].
[27] NPR, Oil Pipeline Damage May Have Happened Months Before the Massive Oil Spill, Oct. 8, 2021, https://www.npr.org/2021/10/08/1044644445/oil-pipeline-damage-may-have-happened-months-before-the-massive-oil-spill [last visited on Oct. 13, 2021].
[28] Reuters, Record 60 Cargo Ships Wait to Unload At Busiest U.S. Port Complex, Sept. 15, 2021, https://www.reuters.com/world/us/record-60-cargo-ships-wait-unload-busiest-us-port-complex-2021-09-15/ [last visited Oct. 13, 2021].
[29] Los Angeles Times, The Smell of Oil Wafted in the Air Friday. Why Did it Take Another Day to Identify Massive O.C. Spill?, Oct. 3, 2021, https://www.latimes.com/california/story/2021-10-03/why-it-took-a-full-day-to-identify-massive-oc-oil-spill [last visited Oct. 13, 2021].

October 2, 2021. Defendants did not reach out to a single government agency or environmental protection organization during this time frame.

**G.      Defendants Failures on Saturday October 2, 2021**

39.     On Saturday, October 2, 2021, at 2:30 a.m., a low-pressure alarm, signaling a failure in the San Pedro Bay Pipeline, went off. As referenced above, (*see* Section V D.), Elly is staffed twenty-four hours a day with operators who purportedly have the training and experience necessary to understand and execute safety procedures during an oil spill crisis. This alarm should have triggered immediate "phone calls to managers, boat crews, regulators, and the U.S. Coast Guard, (*see* Image 8 on next page), and swiftly set in motion steps to shut down the pipeline and platform that feeds it, according to 10 former and current Beta Offshore employees and contractors . . . ."[30] Defendants' own OSPRP mandates that "In General – For Spill Response – Do Not Delay. Plan Ahead. Over-respond and stand down if necessary. *Do not get behind on the curve* . . . ."[31] (*See* Section V D., italics added.) But Defendants got well behind the curve before taking any action, let alone realizing there was a crisis unfolding, and failed to follow their own "15-step action plan." (*Id.*)

40.     At 6:01 a.m. on October 2, 2021, the San Pedro Bay Pipeline was purportedly shutdown. Defendants' OSPRP emphasizes the critical need for communication upon the occurrence of an extraordinary event, providing: "Effective and efficient communication systems are a central requirement for emergency response at *every level*." (Italics added.) Defendants readily admit that they did not communicate to anyone, not only about the failure-sensing alarm, but also the shutdown of their entire system. (*See* Image 8 on next page.) Defendants did not take a single step to address the oil spill for nearly twenty-four hours after the community

---

[30] *See* Reuters, fn.5.
[31] *Id.*

knew about the crisis and almost seven hours after they were informed of the oil leak by their own system.



**Image 8**, Defendants' OSPRP Initial Notifications

41.     According to Willsher, Defendants were first aware of a possible problem at 8:09 a.m. Saturday morning. Defendants did not, however, immediately notify authorities. Rather, Defendants contacted their crisis response team who, in turn, notified the Coast Guard at 9:07 a.m., over three hours after their entire oil system was shutdown. At first glance, these actions by Defendants were in violation of their own OSPRP. (*See* Image 8.) The call to the crisis command center should have been third on their list of calls, but was not.

42.     Defendants recklessly failed to monitor, manage, and/or assess irregularities and/or failures in the San Pedro Bay Pipeline. Given the range of potential crude oil leaked into the coastal waters of Orange County, California, (*see* Section V(B)), Defendants' failure is demonstrated by the OSPRP's mandate that even "[i]f a very small spill occurs[,] . . . notifications must still be made to NRC, the

US Coast Guard, [and] BSEE . . . ."[32] By Defendants' own admission, they were incapable of detecting a "very small spill"; in fact, Defendants own OSPRP guidelines are inconsistent with this mandate—the low-pressure system could not detect thousands of gallons of crude oil leaked from their own system.

43.     Putting aside technology, Defendants' failure to notice, until hours later, that their entire transport system was shut down by 6:01 a.m., is unimaginable. Aside from Defendants' failures to acknowledge the low-pressure alarm at 2:30 a.m. on Saturday, October 2, 2021, or drop in flow rate over the preceding days, if not months, the Defendants purportedly had no idea that, for over two hours, their entire system was shut down. Two inferences emerge: 1) Defendants were extremely reckless in monitoring their own oil system; and/or 2) Defendants intentionally chose not to alert authorities of the crisis until hours after it began. Either way, Defendants' failed to adhere to their OSPRP, which requires "proper reporting as soon as possible."[33] Even if Defendants were collecting information about the crisis and delayed reporting until they possessed "solid" information, they were still in violation of the OSPRP, which precludes "delay[] by the collection of information for reporting."[34]

**H.     Fallout from Defendants' Failures**

44.     The fallout of Defendants' recklessness was felt almost immediately. By the time Defendants managed to shut down the San Pedro Bay Pipeline on Saturday morning, up to 130,000 gallons of crude oil, over 3,100 barrels, had been released into the Pacific Ocean. (*See* Images 9 and 10 on next page.) That evening and into the early morning of Sunday October 3, 2021, toxic oil washed ashore in Hunting and Newport Beach. Over fourteen miles of coastline was stained with crude oil. The

---

[32] OSPRP, fn. 2.
[33] *Id.*
[34] *Id.*

Class Action Complaint                                              Case No.:

environmentally sensitive Talbot Marshlands were contaminated and fish and wildlife were mired in petroleum.



**Image 9**, Effects of Oil Spill



**Image 10**, Effects of Oil Spill

45.    The immediate harm was not limited to the fragile environment along the Orange County coast but reverberated inland. The final day of the fifth annual Great Pacific Airshow, which drew nearly 1.5 million people the day before, was immediately canceled. The event, which was to occur October 1 through 3, 2021, typically generates roughly $68 million dollars for local business from visitors who flock to Huntington Beach for the event.

46.    Within days, beaches and coastal waters stretching from Huntington Beach down to Dana Point were closed. Residents and visitors were told to go home and not to access the beaches or waters as a result of the presence of toxic oil leached from the San Pedro Bay Pipeline. Health officials made clear why. The Orange County Health Care Agency explained: "[S]pilled oil can pose a skin contact concern and it contains volatile components that can evaporate in air. . . . Petroleum products contain toxic chemicals . . . [a]nd prolonged exposure with these chemicals may

cause health issues."[35] The closures affected far more than beach-goers, with nearly all harbors from Huntington Beach to Dana Point closed and vessel traffic prohibited.

47.     The California Department of Fish and Wildlife ("CDFW"), on October 3, 2021, took further action to protect the community. The CDFW closed all coastal waters from Huntington Beach to Dana Point, and for six miles offshore, to fishing and taking of shellfish. On October 5, 2021, the CDFW extended the ban down to San Clemente. Then, on October 7, 2021, the ban grew even larger, extending to 11 fisheries.[36] (*See* Image 11.)



**Image 11**, Fishery Closures

[35] Orange County Health Care Agency, *OC Health Care Agency Issues Health Advisory for Residents Exposed to Oil Contaminants*, Oct. 3, 2021, https://mailchi.mp/ochca/hca-health-advisory-re-oil-spill-10114934 [last visited Oct. 8, 2021] ("OC Health Advisory").

[36] California Department of Fish and Wildlife, Amendment Declaration of Fisheries Closure, Oct. 7, 2021, https://socalspillresponse-com-jtti.s3.us-west-2.amazonaws.com/wp-content/uploads/2021/10/07174741/CDFW-Declaration-Amendment_2_10.07.21.pdf [last visited Oct. 10, 2021].

48.     Not only did this ban have an immediate impact on local fishing activities and the local businesses that benefit from those activities, but it came at a time when fishing seasons were set to begin or were underway. For example, Spiny Lobster season was set to begin October 2, 2021, but is now indefinitely banned along the Orange County coast.[37] Apart from those who make their livelihood utilizing the coastal waters off the Orange County shoreline, restaurants and other establishments have been forced to find alternative sources of fresh seafood. The stigma associated with this oil spill crisis on the local seafood industry will almost certainly affect this region for years to come.

49.     By October 8, 2021, the original 8,230-acre oil spill dispersed in various directions and proceeded to make its way south down the California coast. Crude oil continued to wash ashore, stretching as far south as the coastal beaches of Carlsbad and Oceanside, nearly seventy miles from where the toxic oil first infected Huntington Beach. (*See* Images 12-15 on next page.) By all accounts, large swaths of crude oil remain off the Orange County and Northern San Diego County coast, while the wind and ocean currents drive the crisis further south. During the week of October 4, 2021, states of emergency were declared from the Governor's Office down to the local levels.[38]

---

[37] California Department of Fish and Wildlife, Current California Ocean Recreational Fishing Regulations – Southern Region, Oct. 4, 2021, https://wildlife.ca.gov/Fishing/Ocean/Regulations/Fishing-Map/Southern [last visited Oct. 13, 2021].

[38] CBS News, California Declares State of Emergency in Response to Massive Oil Spill, Oct. 6, 2021, https://www.cbsnews.com/news/california-oil-spill-state-of-emergency/ [last visited Oct. 13, 2021].



**Image 12**, Effects of Oil Spill



**Image 13**, Effects of Oil Spill

**Image 14**, Effects of Oil Spill

**Image 15**, Effects of Oil Spill

50.     From an environmental standpoint, marine life and the diverse animal populations along the Orange County coast have suffered as well. As of Sunday, October 11, 2021, 58 different species of birds and fish had been affected by the oil spill, reports suggest. This is the harm that can be seen. Oil spills also kill algae, called phytoplankton, which is the beginning of the food chain for numerous marine animals.[39] Then, of course, there are the fish or invertebrates that start their lives as larvae, which are "incredibly vulnerable to the effects of oil . . . ."[40] As such, when

[39] Vox, Why the Huntington Beach Oil Spill is So Harmful to Wildlife, Oct. 6, 2021, https://www.vox.com/down-to-earth/22708654/oil-spills-wildlife-huntington-beach-california [last visited Oct. 13, 2021] ("Vox").

[40] Vox, fn. 42.

Class Action Complaint                                          Case No.:

oil permeates the ecosystem in which the larvae begin their maturation, killing off the young, the numbers of fish or invertebrates may very well dip for years to come.[41]

51.     The full extent of this environmental crisis is yet to be seen, but its immediate damage is currently unfolding. Local businesses have seen a dramatic drop in business due to the reduced visitor foot traffic. For example, those who own stores related to fishing activities have witnessed their revenue come to a grinding halt, leaving bills to be paid without a means to do so. Other businesses, in the more trafficked downtown areas of the Orange County coastal communities, are unable to draw any shoppers as a result of the widespread closures, with visitors steering clear of the area. Further, the businesses who thrive on ocean activity—e.g., surfing schools or whale watching—are at serious risk of surviving as the oil crisis continues. These are but the tip of the potential economic fallout from Defendants' actions, inactions, and/or omissions.

## I.     Defendants' History of Violations

52.     Defendants have a history of non-compliance with regulations. The Bureau of Safety and Environment Enforcement, the federal agency that oversees the offshore oil drilling industry, found 125 incidents of non-compliance by BOC.[42] BOC was given warnings fifty-three times, but deemed in violation of regulations seventy-two times. Of the documented violations, seventy-one were "component shut in" violations and one was a "facility shut in" violation. In short, Defendants' history of noncompliance led to numerous instances where oil production and/or transportation had to be shut down.

53.     A "component shut in" violation pertains to a particular piece of equipment or location that is not in accordance with standing regulations and must be

---

[41] *Id.*
[42] PBS News Hour, Company Suspected In Oil Spill Had Dozens of Violations, Oct. 4, 2021, https://www.pbs.org/newshour/nation/company-suspected-in-oil-spill-had-dozens-of-violations [last visited Oct. 13, 2021].

shut down until the violation is corrected.[43] This type of violation occurs when "it is determined" that the non-compliance is part of "an unsafe situation or it poses an immediate danger to personnel or other equipment . . . ."[44] A "facility shut in" violation arises where "the unsafe situation poses an immediate danger to the entire facility or personnel and the specific equipment or location cannot be shut in without affecting the overall safety of the facility."[45] Importantly, a "warning" does not suggest a minor violation; rather, a warning will "normally be issued" in an "after-the-fact situation where no correction is possible" and a "shut in would serve no useful purpose."[46]

54.     BOC received its most recent warning on September 29, 2021, days before, if not during, the immediate oil spill crisis. The details of each violation and warning are unknown at this time.

55.     The current oil spill crisis is not the Beta Unit Complex's first oil spill. In fact, in 1999, one of the crude oil lines connecting Platform Eureka to Platform Elly was "shut in" due to "leakage," according to the Defendants' OSPRP.[47] This failure caused Platform Eureka to be shut down for nine years. Although unclear whether connected to the Platform Eureka shutdown, in the same year, 2,000 gallons of crude oil was spilled from the Beta Unit Complex into the Pacific Ocean, resulting in a $48,000 fine for the operators.[48] More recently, Defendants were fined $85,000

---

[43] Office of Offshore Regulatory Programs, Offshore Safety Improvement Branch, National Office Potential Incident of Noncompliance (PINC) List, Sept. 2016, https://www.bsee.gov/sites/bsee.gov/files/office-pincs-final-92016.pdf [last visited Oct. 10, 2021].
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] OSPRP, fn. 2.
[48] California News Times, OC Oil Spill: Oil Rig Operator Waited 3 Hours to Shut Off Damaged Pipeline Report Says, Oct. 6, 2021, https://californianewstimes.com/oc-oil-spill-oil-rig-operators-waited-3-hours-to-shut-off-damaged-pipeline-report-says/549529/ [last visited Oct. 13, 2021].

Class Action Complaint                                          Case No.:

in 2013 and 2014 for three separate incidents, one of which resulted in the release of oil into the Pacific Ocean.[49]

# VI    PLAINTIFF'S ALLEGATIONS

56.     Plaintiff BEYOND BUSINESS INCORPORATED, d/b/a BIG FISH BAIT & TACKLE, is a California corporation located 1780 Pacific Coast Highway, Seal Beach, California.

57.     BIG FISH BAIT & TACKLE is a landmark in the Seal Beach community, having begun in the 1960s. BEYOND BUSINESS INCORPORATED is the third owner in the store's legacy of owners over the decades.

58.     BIG FISH BAIT & TACKLE exists to serve the fishing communities in and about the Orange County coast. The store provides fishing supplies, such as rods, reels, tackle, lures, and other related items.

59.     A significant draw to BIG FISH BAIT & TACKLE is the live and frozen bait it supplies. For recreational fishermen, both on and offshore, this live bait is the means to successful fishing in the coastal waters. As live and frozen bait can only be kept for so long, BIG FISH BAIT & TACKLE relied, and continues to rely, on regular customers and foot-traffic in order to avoid the economic loss associated with discarding unpurchased, expired items.

60.     As a result of the Defendants' oil spill, BIG FISH BAIT & TACKLE has seen a dramatic reduction in customers and foot traffic. Beginning Friday October 1, 2021, BIG FISH BAIT & TACKLE's customer base has dropped 50% or more, year-over-year (from 2020 pandemic levels).

61.     Much of the live and frozen bait sold in the store has perished. Given the uncertainty surrounding the oil spill and the indefinite ban on fishing activities, BIG FISH BAIT & TACKLE has been unable to determine how much live and frozen bait

---

[49] CNN, Operator of Leaking Oil Infrastructure Has Record of Violations, Oct. 4, 2021, https://www.cnn.com/2021/10/04/us/beta-operating-company-violations/index.html [last visited Oct. 13, 2021].

Class Action Complaint                                              Case No.:

to purchase. The problem being that should BIG FISH BAIT & TACKLE choose to purchase too little, out of an abundance of caution, the business suffers; should it choose to purchase more than demand supports, the business suffers.

62.     BIG FISH BAIT & TACKLE's business has suffered and will continue to suffer. Since Friday October 1, 2021, BIG FISH BAIT & TACKLE has seen its revenue drop significantly over the ensuing weekends and is lucky if it gets any business during the week. BIG FISH BAIT & TACKLE had two employees but had to send them both home due to the economic hardship of the store.

63.     BIG FISH BAIT & TACKLE has and will indefinitely into the future incur unrecouped business expenses, as well as loss of revenue, income, and profits as a result of Defendants' oil spill.

64.     Plaintiff believes the negative consequences of Defendants' oil spill will continue to impact the Orange County fisheries, and consequently, Plaintiff's business, for years to come.

65.     Defendants' actions, inactions, and/or omissions have, therefore, caused present injury to Plaintiff, as well as concrete risk of imminent, additional harm.

## VII    CLASS ACTION ALLEGATIONS

66.     Plaintiff's claims are made on behalf of itself and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

67.     Plaintiff brings this action on its own behalf, and on behalf of a class of similarly situated business, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

**Class:**

> All persons or businesses that claim economic losses, or damages to their occupations, businesses, and/or business property, located along the California coast from Long Beach to Oceanside, California, as a result of Defendants' October 1, 2020 through October 2, 2021 oil spill from the San Pedro Bay Pipeline (Pipeline P00547), referred to as the Huntington Beach Oil Spill.

68.     Excluded from the Class are all (a) officers and directors of the Defendants; (b) all judges or judicial officers assigned to this matter and their

Class Action Complaint                                          Case No.:

immediate family and staff; and (c) any legal representative, successor, or assign of any excluded persons or entities.

69.   <u>Numerosity</u>:  Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the possession of local and county-level public agencies, for example, and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of injured businesses, property owners, fishers, event organizers, and employees that are the subject of the Class.

70.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to, whether:

       a.     each is a direct victim of the oil spill caused by the Defendants;

       b.     the date the Class members' injuries began is on the same day and/or close in time;

       c.     Class members reasonably expected Defendants would exercise the appropriate care in operating the Beta Unit Complex;

       d.     Defendants should have discovered, disclosed, and remedied the cause of the oil spill;

       e.     Defendants were negligent in their construction, maintenance, observations, operation, and/or repairs of the San Pedro Bay Pipeline;

       f.     Defendants' actions, inactions, and/or omissions were a substantial factor in causing harm to Class members;

       g.     Defendants engaged in ultrahazardous activities in violation of the OSPRRA;

     h.     Defendants discharged toxic crude oil into navigable waters off the Orange County coast from the San Pedro Bay Pipeline;

     i.     Defendants violated California's Unfair Competition Law pursuant to Business and Profession Code section 17200, *et seq.*; and

     j.     Defendants negligently interfered with Class members' prospective economic advantage.

71.   <u>Typicality</u>: Plaintiff's claims related to the Huntington Beach Oil Spill are typical of the claims of the Class because Plaintiff began to experience its respective injuries on or about the same time, were directly affected by the oil spilled from the San Pedro Bay Pipeline, and Defendants are responsible to the Plaintiff and Class for the crisis. Furthermore, Plaintiff and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct in failing to detect, correct, and/or notify the public and authorities about irregularities or failures in the San Pedro Bay Pipeline. Plaintiff advances these same claims and legal theories on behalf of itself and all absent Class members.

72.   <u>Adequacy</u>: Plaintiff adequately represents the Class because its interests do not conflict with the interests of the Class it seeks to represent, it has retained counsel who are competent and highly experienced in complex class action litigation, and it intends to prosecute this action vigorously. Plaintiff and its counsel are well-suited to fairly and adequately protect the interests of the Class.

73.   <u>Superiority</u>: A class action is superior to all other available means of fairly and efficiently adjudicating the claims brought by Plaintiff and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for Class members on an individual basis to effectively redress the wrongs done to them.

Even if Class members could afford such individual litigation, the courts cannot. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system, particularly where the subject matter of the case may be technically complex. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, individual Class members can be readily identified and notified based on, *inter alia*, city and county property records, city and county business records, and other, publicly controlled information.

74. Defendants have acted, and refuse to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## VIII   CAUSES OF ACTION

### COUNT I

### STRICT LIABILITY UNDER LEMPERT-KEENE-SEASTRAND OIL SPILL PREVENTION AND RESPONSE ACT ("OSPRRA")

**(Gov. Code § 8670, *et seq.*)**

**(As to all Defendants)**

75. Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

76. The OSPRRA provides, in pertinent part: "A responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured person that arise out of, or are caused by, a[n oil] spill [into or onto marine waters]." Cal. Gov. Code § 8670.56.5(a).

77.     Defendants are "responsible part[ies]," in that AOC is an "owner" and BOC and SPBPC are "transporter[s] of oil" as specified under the OSPRRA. Cal. Gov. Code § 8670.3(y)(1).

78.     The location of the Defendants' Beta Unit Complex is in "marine waters," being that the Pacific Ocean is subject to "title influence." Cal. Gov. Code § 8670.3(j).

79.     The San Pedro Bay Pipeline, and the Beta Unit Complex generally, transports "oil," which includes "any kind of petroleum, liquid hydrocarbons, or petroleum products," such as "crude oil." Cal. Gov. Code § 8670.3(o).

80.     Defendants are subject to strict liability under the OSPRRA for the oil leaked from the San Pedro Bay Pipeline. Defendants do not have a defense under California Government Code section 8670.56.5(b).

81.     On Saturday October 2, 2021, and for potentially weeks or months before, Defendants allowed crude oil to be discharged from the San Pedro Bay Pipeline into the coastal waters of Orange County, California. Defendants' conduct resulted in significant environmental and economic damages to the local communities, which has damaged and will continue to damage Plaintiff and Class members into the future. Plaintiff and Class members bear no responsibility or fault.

82.     The OSPRRA allows Plaintiff and Class members to recover an array of damages including, but not limited to: 1) costs associated with damage to natural resources; 2) "economic losses resulting from destruction of or injury to, real or personal property,"; 3) "[l]oss of taxes, royalties, rents, or net profit" associated with harm to real or personal property and natural resources; or 4) "[l]oss of profits or impairment of earning capacity" due to harm of real or personal property or natural resources. Cal. Gov. Code § 8670.56.5(h).

83.     Defendants' actions, inactions, and/or omissions that led to the oil spilled from the San Pedro Bay Pipeline caused the loss and/or impaired the use of property or natural resources the Plaintiff and Class members relied upon for their

livelihood. Such reliance includes, but is not limited to, coastal marine waters, beaches, beach front areas, fish and shellfish populations, and harbors, marinas, and piers.

84.     Because Plaintiff and Class members rely upon natural resources for subsistence use; Plaintiff and certain Class members have ownership or leasehold interests in real or personal property damaged by Defendants' oil spill; Plaintiff and certain Class members derive at least 25 percent or more of their annual or seasonal earnings from activities that utilize property or natural resources damaged by Defendants' oil spill; and/or Defendants' oil spill caused a loss of taxes, royalties, rents, and/or net profit due to harm to property or natural resources, Defendants are liable to Plaintiff and Class members under the OSPRRA.

85.     The harms and/or losses identified have continued and will continue into the future, resulting in the impairment of earning capacities and lost profits for Plaintiff and Class members. Further, the stigma associated with certain activities, particularly in the fishing industries, will last well beyond the tangible harm.

## COUNT II
## OIL POLLUTION ACT OF 1990
### (33 U.S.C. § 2701, *et seq.*)
### (As to all Defendants)

86.     Plaintiff incorporates by reference each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

87.     The Federal Oil Pollution Act ("OPA") provides that "each responsible party for . . . a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines . . . is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a).

88.     Pursuant to 33 U.S.C. § 2702(b)(2), damages in the form of injury or harm to "real or personal property," "subsistence use of natural resources,"

"revenues" in the form of "net loss taxes, royalties, rents, fees, or net profit shares," and "profits and earning capacity" are recoverable.

89.   Defendants are a "responsible party," as they own and operate the "pipeline." 33 U.S.C. § 2701(32)(F).

90.   The San Pedro Bay Pipeline is a "facility" under the OPA, in that it is a "structure[s], equipment, or device" used for "handling, transferring, . . . or transporting oil." 33 U.S.C. § 2701(9).

91.   Defendants "discharged" oil pursuant to 33 U.S.C. § 2701(7).

92.   The Pacific Ocean and Orange County coast are "navigable waters" under the OPA, 33 U.S.C. § 2701(21).

93.   Defendants' actions, inaction, and/or omissions directly led to thousands of gallons of toxic crude oil to be spilled into and upon the navigable waters of the Orange County coast.

94.   Plaintiff and Class members have suffered and will continue to suffer injury, economic loss, and loss of profits and earning capacity as a result of Defendants actions, inactions, and/or omissions that led to the oil spill.

95.   Defendants are responsible not only for current damages and harm suffered by Plaintiff and Class members, but also future injuries, restoration of environmentally sensitive areas, and losses associated with the stigmatization of the fishing industries.

**COUNT III**

**STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES**

**(Under California Law)**

**(As to all Defendants)**

96.   Plaintiff incorporates by reference each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

97.   At all relevant times herein, Defendants owned, operated, and maintained exclusive control and authority over the San Pedro Bay Pipeline.

98.   At all relevant times herein, Defendants were under a continuing duty to protect Plaintiff and Class members from the harm caused by the oil spill from the San Pedro Bay Pipeline.

99.   Defendants were engaged in an ultrahazardous activity by transporting flammable, hazardous, and toxic crude oil through the San Pedro Bay Pipeline. The hazardousness of the activity was compounded by the poor monitoring and inspection of the previously damaged pipeline in an area of high consequence.

100.   Plaintiff and Class members directly and proximately suffered harm as a result of Defendants' transportation through and the subsequent oil spill from the San Pedro Bay Pipeline.

101.   The harm suffered by Plaintiff and Class members includes, but is not limited to, lost revenue, opportunities, profits, earnings, and earning capacity, damage to their reputations, and associated expenses.

102.   The harm to Plaintiff and Class members was and is of a nature that should and would have been anticipated by Defendants as a risk of their ultrahazardous activity of transporting toxic crude oil through the San Pedro Bay Pipeline. This is especially true given the proximity of the San Pedro Bay Pipeline to the Orange County coastal community, a High Consequence Area. Further, given the significant increase in the buildup of large commercial vessels in the area, significantly increasingly the likelihood of an anchor entanglement with the San Pedro Bay Pipeline, their ultrahazardous activities required further care and attention.

103.   Defendants' operation of the San Pedro Bay Pipeline and the subsequent oil spill was a substantial factor in the harm caused to Plaintiff and Class members.

104.   Plaintiff and Class members are entitled to recover actual damages under a theory of strict liability.

105.   Defendants' actions, inactions, and omissions were carried out with malice, fraud, and/or oppression as discussed herein.

# COUNT IV

## NEGLIGENCE

### (Under California Law)

### (As to all Defendants)

106.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

107.   Defendants owed a duty to Plaintiff and Class members to exercise reasonable and ordinary care in scope and course of their activities. *See e.g,* Cal. Civ. Code § 1708 ["Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights."]. Such reasonable and ordinary care extended to, but is not limited to, design, construction, operation, maintenance, and/or detection associated with the San Pedro Bay Pipeline, such that the surrounding Orange County coastal communities suffer no adverse effects as a result of Defendants' actions. The duty discussed herein arose from federal, state and local laws, to name a few, that required Defendants to carry out their activities with respect to the San Pedro Bay Pipeline in a manner that would not harm public health and safety.

108.   Defendants breached that duty to Plaintiff and Class members by, among other things, failing to install or utilize reasonable safety equipment to prevent a spill—e.g., modern pressure or flow sensors, any acoustic or vibration sensors, or regular satellite imaging—failing to detect and repair the preexisting damage to the San Pedro Bay Pipeline, and failing to promptly respond to, contain, and notify others of the oil spill. Defendants also breached this duty of care by failing to adequately implement safety and pipeline failure protocols within their crew aboard the Beta Unit Complex. Further, Defendants failed to monitor, detect, and/or remedy the precursor damage to the San Pedro Bay Pipeline which led to the oil spill.

109.   Defendants had ample knowledge of the risks associated with their activities and the care needed to respond to those risks. Had Defendants exercised the reasonable care expected of and imposed upon them in the construction, maintenance, detection, and/or repair of the San Pedro Bay Pipeline, they would have known that the pipeline could lead to an oil spill or otherwise fail, and leak thousands of gallons of oil into the Orange County coastal waters.

110.   As a direct and proximate result of Defendants' negligence, at a minimum, and/or recklessness, at worst, Plaintiff and Class members have sustained damages. The following is a non-exhaustive list of the harm suffered and likely to be suffered into the future:

    a.    cancellation of beach events, such as the last day of the Great Pacific Airshow;

    b.    forced closure of water-related businesses, such as surfing, sailing, and kayaking schools, due to the various city closures;

    c.    forced closures of harbor and coastal boat excursions, such as whale watching or sunset cruises;

    d.    cancellation of fishing activities, both from shore and offshore, caused by the necessary CDFW ban due to the oil spill;

    e.    significant reduction of foot traffic (residents and visitors) along the Orange County coastal communities due to the toxic environment and closures, which, in turn, significantly suppressed, and continues to suppress, local business revenues; and

    f.    the overall reduction in revenue to the businesses that rely upon and support the aforementioned activities.

111.   The harm suffered will continue to be felt into the future due to the environmentally sensitive location of the oil spill. The environmental impact of the oil spilled from the San Pedro Bay Pipeline has and likely for years will damage

certain segments of the marine animal populations, such as fish and crustacean whose existence are significantly impacted by exposure to toxic oil. Not only will the fishing industries be hard, but so too will the businesses that partner with the fishing industry.

112.   The shear psychological impact associated with an oil spill along the pristine and widely-utilized Orange County coast will significantly hinder businesses in the community. The public has already been told to stop eating fish and shellfish caught in Orange County, for example.[50] Regardless of when authorities or Plaintiff and Class members believe seafood sourced from the Orange County coast is safe for consumption, the general public will be left with a polluted view of fish and shellfish from the affected areas. This will result in downward pressure on the price of fish and shellfish caught along the coast from both businesses who previously sought locally-sourced seafood and the general public. This same stigma extends beyond seafood, as visitors can hardly forget views of the Orange County coast covered in toxic crude oil, inevitably leading to a reduction in foot traffic in the coastal cities.

## COUNT V

## VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. and Prof. Code § 17200)

### (As to all Defendants)

113.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

114.   Defendants' conduct violated the unfair, unlawful and fraudulent prongs of California's Unfair Competition Law, under Business and Profession Code, section 17200, *et seq.* ("UCL").

---

[50] CBS Los Angeles, Huntington Beach Oil Spill: Public Warned to Avoid Consuming Fish, Shellfish Caught in OC, Oct. 4, 2021, https://losangeles.cbslocal.com/2021/10/04/public-warned-to-avoid-consuming-fish-shellfish-caught-in-oc-because-of-oil-spill/ [last visited Oct. 13, 2021].

115.    Defendants' conduct amounted to "unfair" business practices as the UCL prohibits all wrongful business activities, regardless of the context, including the present. Defendants' practices, more importantly, offend established public policies and are immoral, unethical, oppressive, and unscrupulous. The benefits Defendants' will claim to bestow upon the community through their activities in no way offsets the degree of harm caused by their actions, inactions, and/or omissions. Defendants' conduct—the negligent and/or reckless operation, maintenance, detection, and/or repair of the San Pedro Bay Pipeline—has no utility when compared to the harm done to Plaintiff and Class members.

116.    Defendants' conduct was "unlawful," in that it violated various statutes and regulations, including, but not limited to: 1) the OSPRRA; 2) the Porter-Cologne Act, Water Code section 13000, *et seq.*; 3) California Fish and Game Code section 5650, *et seq.*; 4) the Oil Pollution Act; and 5) federal, state, and local oil spill notification laws. *See e.g.,* Cal. Health & Safety Code § 25510(a). Defendants further violated their own OSPRP.

117.    Defendants' conduct was "fraudulent" in that their business practices, within the meaning of the UCL, were likely to, and did, deceive reasonable members of the public into believing that Defendants were exercising the proper degree of care, safety, and consideration with respect their activities when, in fact, they were not. Members of the public have been harmed as a result.

118.    As a direct and proximate cause of Defendants' fraudulent, unfair, and/or unlawful activities, which led to the San Pedro Bay Pipeline oil spill, Plaintiff and Class members have sustained damages.

119.    Defendants have also been unjustly enriched as a result of these fraudulent, unfair, and/or unlawful activities and should be required to make restitution payments to Plaintiff and Class members pursuant to California Business and Profession Code sections 17203 and 17204.

120.   Defendants' actions, inactions, and omissions were carried out with malice, fraud, and/or oppression as discussed herein.

## COUNT VI
## NEGLIGENCE PER SE
### (Under California Law)
### (As to all Defendants)

121.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

122.   At all relevant times herein, Defendants negligently, wantonly, carelessly, and/or recklessly maintained and operated the San Pedro Bay Pipeline.

123.   Defendants violated several statutes, ordinances, and/or regulations, including, but not limited to: 1) the OSPRRA; 2) the Porter-Cologne Act, Water Code section 13000, *et seq.*; 3) California Fish and Game Code section 5650, *et seq.*; 4) the Oil Pollution Act; and 5) federal, state, and local oil spill notification laws. *See e.g.,* Cal. Health & Safety Code § 25510(a). Defendants further violated their own OSPRP.

124.   As a direct consequence of Defendants' wrongful actions, inactions, and/or omissions addressed herein, Plaintiff and Class members have suffered and will continue to suffer economic harm, injury, and losses.

125.   Plaintiff's and Class members' harm directly results from activities the laws identified above were designed to prevent. Plaintiff and Class members are within the class of individuals the respective laws were designed to protect.

126.   Defendants' acts, inactions, and/or omissions were carried out with malice, fraud, and/or oppression as discussed herein.

Class Action Complaint                                      Case No.:

# COUNT VII

## NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Under California Law)

### (As to all Defendants)

127.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

128.   Plaintiff and Class members have existing or prospective economic relationships with residents of Orange County, visitors to Orange County, and other individuals and organizations doing business in and related to Orange County.

129.   These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiff and Class members.

130.   Defendants knew or should have known of these existing and prospective economic relationships.

131.   Defendants owed a duty to Plaintiff and Class members to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiff and Class members.

132.   Defendants breached that duty to Plaintiff and Class members by, for example, failing to install reasonable safety equipment to prevent such a spill, and failing to promptly respond to and contain the spill.

133.   Defendants knew and/or should have known that, if they failed to act with reasonable care, the existing and prospective economic relationships of Plaintiff and Class members would be interfered with and disrupted.

134.   Defendants were negligent and failed to act with reasonable care as discussed herein.

135.   Defendants engaged in wrongful acts, inactions, and/or omissions as described herein, including, but not limited to, violations of federal, state, and local

1   laws that require Defendants to operate its pipeline in a manner that does not damage
2   public health and safety.

3       136.   As a direct and proximate result of Defendants wrong acts, inactions,
4   and/or omissions, Plaintiff and Class member have suffered, and will continue to
5   suffer, economic harm, injury, and loss as described herein.

6                                **PRAYER FOR RELIEF**

7       WHEREFORE, Plaintiff, prays for judgment against Defendants, and each of
8   them as follows:

9       A.    for an order certifying this action as a class action;

10      B.    for an order appointing Plaintiff BEYOND BUSINESS
11            INCORPORATED, d/b/a BIG FISH BAIT & TACKLE, as
12            representative of the class and counsel of record as class counsel;

13      C.    permanently enjoining Defendants from operating the San Pedro Bay
14            Pipeline without adequate safety, detection, and response measures;

15      D.    for appropriate injunctive relief, including public injunctive relief, to
16            include, not but limited to, an order requiring Defendants to repair and
17            restore fisheries and habitats affected by the oil spill and the
18            accompanying reputation of the Orange County, California seafood
19            industry;

20      E.    for damages and statutory damages in an amount to be proven at trial;

21      F.    for recovery of damages in the form of disgorgement and unjust
22            enrichment as permitted by applicable laws;

23      G.    for an award of exemplary and punitive damages as permitted by
24            applicable laws and in an amount to be proven at trial;

25      H.    for treble damages insofar as permitted by applicable laws;

26      I.    for pre-judgment and post-judgment interest on any amounts awarded;

27      J.    for appropriate individual relief as requested above and permitted by
28            applicable laws;

Class Action Complaint                                          Case No.:

1  K.    for payment of attorneys' fees and costs as permitted by applicable laws;
2        and

3  L.    for such other and further relief as this Court deems just and proper.

4

5  Dated: October 14, 2021                    Respectfully Submitted,

6                                             */s/ Richard D. McCune*
                                             Richard D. McCune
7
8                                             Stephen G. Larson, State Bar No. 145225
                                             slarson@larsonllp.com
9                                             Stephen E. Bledsoe, State Bar No. 157811
                                             sbledsoe@larsonllp.com
10                                            Rick Richmond, State Bar No. 194962
                                             rrichmond@larsonllp.com
11                                            **LARSON, LLP**
                                             600 Anton Blvd., Suite 1270
12                                            Costa Mesa, CA 92626
                                             Telephone: (949) 516-7250
13                                            Facsimile: (949) 516-7251

14                                            Richard D. McCune, State Bar No. 132124
                                             rdm@mccunewright.com
15                                            David C. Wright, State Bar No. 177468
                                             dcw@mccunewright.com
16                                            James G. Perry (SBN 281356)
                                             jgp@mccunewright.com
17                                            **MCCUNE WRIGHT AREVALO, LLP**
                                             18565 Jamboree Road, Suite 550
18                                            Irvine, CA 92612
                                             Telephone: (909) 557-1250
19                                            Facsimile: (909) 557-1275

20                                            *Attorneys for Plaintiff and the Proposed Class*

21                    **DEMAND FOR JURY TRIAL**

22        Plaintiff requests a jury trial on any and all counts for which trial by jury is
23  permitted.

24  Dated: October 14, 2021                    Respectfully Submitted,

25                                             */s/ Richard D. McCune*
                                             Richard D. McCune
26
27                                             Stephen G. Larson, State Bar No. 145225
                                             slarson@larsonllp.com
28                                             Stephen E. Bledsoe, State Bar No. 157811
                                             sbledsoe@larsonllp.com

-42-

Rick Richmond, State Bar No. 194962
rrichmond@larsonllp.com
**LARSON, LLP**
600 Anton Blvd., Suite 1270
Costa Mesa, CA 92626
Telephone: (949) 516-7250
Facsimile: (949) 516-7251

Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
James G. Perry (SBN 281356)
jgp@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
18565 Jamboree Road, Suite 550
Irvine, CA 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

*Attorneys for Plaintiff and the Proposed Class*

Class Action Complaint                                      Case No.: